IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN P. HARRIS, III and                  :               CIVIL ACTION
KIMBERLY HARRIS
                                         :
            v.                           :
                                         :
UNITED STATES OF AMERICA                          NO. 03-6430

## MEMORANDUM OF DECISION

THOMAS J. RUETER                                  November 2, 2005
United States Magistrate Judge

Before the court for decision is an action filed by plaintiffs, John P. and Kimberly

Harris, husband and wife, under the Federal Tort Claims Act.  The defendant is the United States

of America.

The parties consented to a trial before the undersigned and the Honorable Gene

E.K. Pratter referred the trial to this court by Order dated October 21, 2004 (Doc. No. 16).  Trial

commenced on June 20, 2005 and testimony was heard through June 24, 2005.  Each party

submitted proposed findings of fact and conclusions of law.  Closing arguments were presented

on July 29, 2005.  Although the court cites to various specific exhibits in this Memorandum of

Decision, the court has reviewed and considered every exhibit admitted into evidence by both

parties as well as all testimony presented during the trial.

In accordance with Fed. R. Civ. P. 52(a), the court makes the following:

## I.      FINDINGS OF FACT

### A.      The Accident

1.      On May 6, 2002, Mr. Harris was struck by a United States Postal Service

tractor-trailer truck while stopped at a red light on Route 611 in Montgomery County,

Pennsylvania (the "Accident").  As a result of the impact, Mr. Harris' car was pushed into a gas station across from the intersection.  (N.T., 6/22/05, at 110, 112.)  Mr. Harris' car was damaged beyond repair.

2.　　At the time of the Accident, Mr. Harris was on his way to Temple University School of Law ("Temple Law School") to take a final examination.  (N.T., 6/22/05, at 116.)

3.　　Defendant does not contest liability; the only issue for the court to decide is damages.

**B.　Mr. Harris' Law School Education**

4.　　Mr. Harris began studying at Temple Law School in the Fall of 1999.  (Ex. P-27.)

5.　　Mr. Harris' cumulative grade point average after the first two years of law school was 2.55.  (Ex. P-27.)

6.　　In the first two years of law school, Mr. Harris received two "D+s."  (N.T., 6/21/05, at 90; Ex. P-27.)

7.　　Mrs. Harris was diagnosed with cancer during Mr. Harris' Fall 2001 semester at Temple Law School.  (N.T., 6/22/05, at 93.)

8.　　During the Fall 2001 law school semester, Mr. Harris accompanied his wife to doctors' appointments and provided assistance with home responsibilities causing him to miss classes.  Mr. Harris failed a course this semester.  (N.T., 6/22/05, at 93-94; Ex. P-27.)

9.     For the first semester of his third year, in the semester preceding the Accident in May 2002, Mr. Harris' grade point average at Temple Law School was 1.64.  (N.T., 6/21/05, at 93; Ex. P-27.)

10.     Because he failed a course during the first semester of the third year and because he took only four instead of five courses in the second semester of the third year, Mr. Harris did not graduate with his class in the Spring of 2002.  Id. at 96-97.  And see N.T., 6/22/05, at 95-96.)

11.     The Accident was not the cause of Mr. Harris' failure to graduate with his class in the Spring of 2002.  Id.

12.     Mr. Harris received six grades post-Accident.  (N.T., 6/21/05, at 95-96, 199-200.)  He received grades of  "D+," "C+," "B" and three "A-s."  Id. at 95, 179; N.T., 6/22/05, at 102; Ex. P-27.   These grades raised Mr. Harris' overall grade point average to 2.26. (Ex. P-27.)

13.     Prior to the Accident, Mr. Harris received six grades in the "D" to "F" range.  (N.T., 6/21/05, at 180.)

14.     Mr. Harris did not take the Pennsylvania bar examination in February of 2003 or July of 2003.  He took and failed the principal portion of the bar examination in February 2004.  He did not take the examination in July 2004.  He took it again in February 2005 and failed.  Although he borrowed a friend's bar review materials, Mr. Harris did not take a bar review course in February 2004 or 2005.  (N.T., 6/22/05, at 28-29, 263-68.)  Participation in a bar review course might improve Mr. Harris' chances of passing the bar examination.  (N.T., 6/24/05, at 33-34.)

15.     Mr. Harris successfully completed the ethics portion of the bar examination post-Accident.  (N.T., 6/21/05, at 185.)  This portion of the bar examination lasts one and one-half hours and contains fifty multiple choice questions.  Id.

### C.     Physical Injuries From the Accident

16.     Mr. Harris testified regarding the physical, cognitive and emotional injuries he claims he suffered as a result of the Accident.  Mr. Harris also testified as to his subjective symptoms relating to these injuries.  Mr. Harris' testimony is not totally credible as many of his subjective complaints are not supported by the medical evidence of record.

17.     Shortly after the Accident, Mr. Harris exited his vehicle.  (N.T., 6/22/05, at 113.)  While still at the scene, Mr. Harris began to experience pain in the center of his neck.  His neck became stiff.  He then experienced pain from his elbows to his forearms and wrists in both arms.  (N.T., 6/22/05, at 115.)

18.     Plaintiff initially refused to go to the hospital since he did not wish to be late for his law school examination.  (N.T., 6/22/05, at 115.)

19.     When Mr. Harris attempted to hand his license and registration to the police officer, he had difficulty holding the items and dropped them several times.  (N.T., 6/22/05, at 116.)

### i.     Abington Hospital Emergency Room

20.     Mr. Harris was taken to the emergency room at Abington Hospital.  (N.T., 6/22/05, at 117-18.)

21.     At the emergency room, the pain in Mr. Harris' neck and forearms increased, and he experienced numbness in his hands.  (N.T., 6/22/05, at 119.)

4

22. At the emergency room, Mr. Harris attempted to lie back on the bed and he lost control of his neck and fell backwards. (N.T., 6/22/05, at 118.)

23. Mr. Harris found the experience in the emergency room to be "scary." (N.T., 6/22/05, at 120.)

24. After an MRI, Mr. Harris was admitted to the Intensive Care Unit and was placed in a neck brace and administered steroids. (N.T., 6/22/05, at 122-23.)

25. The MRI revealed a "moderate central disc herniation at C5-6 which is compressing the thecal sac and causing a mild impression on the cervical cord." (Ex. P-7(a), (b).)

26. According to the medical records, the disc herniation was described as "very small" to "moderate" at various times throughout Mr. Harris' treatment history. (Exs. P-7(a), P-8(f), P-14, P-15, P-17.)

27. Mr. Harris also was diagnosed with a "mild central cord syndrome." (Ex. P-8(f).)

28. Plaintiff was discharged from the hospital the next day, on May 7, 2002. (N.T., 6/22/05, at 128.)

29. Mr. Harris has seen numerous treating and consulting physicians since the Accident. He has reported a variety of complaints including pain, weakness in his left arm and hand, difficulty sleeping, memory and concentration problems, sexual problems, dizziness and headaches.

### ii.    Dr. Star

30.    Plaintiff's treating orthopaedist at the hospital was Andrew M. Star, M.D. (Ex. P-8(f).)

31.    Approximately two weeks after the Accident, on May 15, 2002, Dr. Star evaluated Mr. Harris at his office.  At that time, Mr. Harris' neck was sore, and his left hand was a little weak and numb, although he had good grip strength.  (Ex. P-8(a).)  Mr. Harris had full range of motion in his neck.  Id.

32.    On May 28, 2002, Mr. Harris again saw Dr. Star.  At that time, Mr. Harris was improving overall.  His left arm remained weak, but Dr. Star described the weakness as "nothing dramatic."  (Ex. P-8(a).)

33.    Dr. Star noted that Mr. Harris had other symptoms including headaches and visual problems.  Approximately one month later, on June 21, 2002, Mr. Harris complained of headaches to his family physician, Matthew J. Winas, D.O., but denied visual problems.  (Ex. 9(a).)  Dr. Star referred Mr. Harris to a trauma surgeon and agreed with Mr. Harris' decision to see a neurologist.  (Ex. P-8(a).)

34.    A follow-up cervical spine MRI on June 4, 2002, showed some bulging of the herniated disc, but no significant cord compression.  (Exs. P-8(a), P-14.)  Dr. Star recommended against surgery to remove the disc.  Id.  Mr. Harris' strength was "much better to the point where [Dr. Star could] not discern a difference left versus right."  Id.  Mr. Harris was advised to avoid diving and contact sports.  Id.

35.     By September 11, 2002, Mr. Harris reported to Dr. Star that he "still has some aching in his neck," but otherwise had good range of motion.  (Ex. P-8(b).)  Mr. Harris further reported that he "feels comfortable" and "can live with this."  Id.

36.     On September 11, 2002, Mr. Harris had "some C6 weakness on the left with dorsiflexion of the wrist."  (Ex. P-8(b).)  He only noticed the weakness "doing extreme sorts of activities."  Id.

37.     On January 2, 2003, Mr. Harris' left hand continued to bother him.  (Ex. P-8(c).)  Mr. Harris had suffered an episode of severe pain in the small and ring finger of the left hand.  Id.  Dr. Star noted tenderness but no swelling.  Id.

38.     In a final follow-up appointment on January 30, 2003, Dr. Star reviewed the MRI with Mr. Harris showing a "small central herniation at C5-C6 without significant nerve compression."  (Ex. P-8(c).)  Mr. Harris continued to have "neck problems," but Dr. Star recommended against surgery.  Id.

39.     At this final appointment, Mr. Harris complained of "fuzziness he feels in his head and his memory problems."  (Ex. P-8(c).)  Dr. Star referred Mr. Harris to a neurologist for these problems.  Id.

40.     The court finds Dr. Star's opinion in a letter dated April 23, 2003 to be supported by the evidence in the record.  (Ex. P-8(f).)  In that letter, almost one year after the Accident, Dr. Star reported that he had first seen Mr. Harris at Abington Memorial Hospital and that the "mild central spinal cord syndrome . . . had almost completely resolved by the time I had seen him."  (Ex. 8(f).)  Dr. Star further opined that Mr. Harris' "neck or arm complaints should [not] be a significant limiting factor for him in future employment at sedentary tasks."  Id.

### iii.   Dr. Redenbaugh

41.   On June 25, 2002, Mr. Harris saw James E. Redenbaugh, M.D., a neurologist, for an evaluation of complaints of headaches, dizziness and arm pain.  Dr. Redenbaugh diagnosed Mr. Harris with cervical strain, possible mild concussion, possible cervical radiculopathy of the left arm, central disc bulge at C5-6, and possible nerve root irritation causing discomfort on the left side.  Dr. Redenbaugh recommended physical therapy and prescribed Robaxin and Relafen, and discontinued use of Vioxx.  (Ex. P-11(a).)

42.   Mr. Harris reported that his headaches were occurring daily, and sometimes were vertex and sharp.  His headaches decreased when he ceased wearing a cervical collar.  Dr. Redenbaugh concluded that Mr. Harris' headaches and dizziness "are a direct relationship to the cervical strain."  (Ex. P-11(a).)

43.   Mr. Harris underwent physical therapy for approximately one month, from June 29, 2002 through August 1, 2002, at Good Shepherd Outpatient Rehabilitation Center.  (Ex. P-10.)

44.   On August 5, 2002, Mr. Harris reported to Dr. Redenbaugh that he "feels stronger and more cognitively intact."  (Ex. P-11(c).)  His neck movement was fairly full without significant pain.  Mr. Harris' left arm was "almost normal with a mild subjective weakness of biceps and maybe the deltoid."  Id.

45.   On October 16, 2002, Mr. Harris reported to Dr. Redenbaugh that while he still had intermittent neck pain, "it is getting somewhat better."  (Ex. P-11(e).)  Mr. Harris used an anti-inflammatory about once a week, and occasionally used a prescribed pain reliever, Robaxin.  Id.  He had no radiation of pain down the left arm, but his left arm continued to feel

"somewhat weaker and less coordinated than the right." Id.  The fifth digit on his left hand was

"quite painful and stiff." Id.  The pain in his left fifth digit was questionable for arthritis, but

"most likely related to [the] motor vehicle accident." Id.

     **iv.**    **Dr. Brody**

     46.    Leonard A. Brody, M.D. performed an orthopaedic evaluation of Mr.

Harris on July 10, 2003 at the request of plaintiffs' counsel.  (Ex. P-12(a).)  The court finds Dr.

Brody's testimony and opinions to be credible and supported by the evidence.

     47.    Mr. Harris' chief complaint to Dr. Brody was "some neck pain that has

improved somewhat since the 5/6/02 incident" and "some left arm weakness."  (Ex. P-12(a).)

     48.    Mr. Harris had a full range of motion of the cervical spine in all planes.

(Ex. P-12(a).)  He complained of pain at the extremes of left lateral bending and rotation.  Id.

     49.    Mr. Harris had "very minimal left-sided paracervical muscle spasm," and a

"slightly decreased biceps tendon reflex on the left."  (Ex. P-12(a).)

     50.    According to the MRI dated June 4, 2002, Mr. Harris suffered a small

central disc herniation at the C5-6 level and C6 radiculopathy on the left.  (Ex. P-12(a).)

     51.    Mr. Harris "should not have any difficulties doing sedentary-type

activities."  (Ex. P-12(a).)

     52.    On May 17, 2005, Dr. Brody performed an orthopaedic re-evaluation of

Mr. Harris.  (Ex. P-12(b).)  At that time, Mr. Harris was no longer receiving "active medical

treatment." Id.

     53.    Mr. Harris' chief complaints were unchanged from his initial orthopaedic

evaluation on July 10, 2003.  (Ex. P-12(b).)

54.     Mr. Harris had full flexion, extension, rotation, and lateral bending.  (Ex. P-12(b).)  Mr. Harris complained of pain only at the extremes of left lateral bending and rotation. Id.  Mr. Harris continued to have left-sided paracervical muscle spasm, slightly decreased biceps reflex on the left, and some decreased sensation in the C6 distribution on the left.  Id.

55.     Dr. Brody's diagnosis remained unchanged: a C5-6 disc herniation with C6 radiculopathy on the left.  Mr. Harris can perform sedentary work.  (Ex. P-12(b).)

**v.     Dr. Norelli**

56.     Charles C. Norelli, M.D. is a physiatrist who saw and treated Mr. Harris from April 22, 2004 through September 2, 2004.  (Ex. P-13.)  At that time, Mr. Harris complained of pain in his neck and weakness in the left arm, but no sensory deficits.  (N.T., 6/21/05, at 215.)  The court finds Dr. Norelli's testimony and opinions are credible and supported by the record.

57.     When pain continues almost two years post-Accident, it most likely is a chronic condition.  (N.T., 6/21/05, at 217-18.)

58.     Mr. Harris' pain waxes and wanes, but he rated it an eight out of ten in April, 2004.  (N.T., 6/21/05, at 217.)

59.     Mr. Harris can lift heavy objects but it is painful.  (Ex. P-13(e).)

60.     Mr. Harris' pain does not prevent him from walking.  (Ex. P-13(e).)

61.     Mr. Harris can sit as long as he likes in "a special chair."  (Ex. P-13(e).)

62.     Mr. Harris' pain prevents him from standing more than one hour.  (Ex. P-13(e).)

63.      Mr. Harris' pain interrupts his sleep one-half of the time.  (Ex. P-13(e).)

64.   Mr. Harris' pain reduced his ability to exercise as he had in the past.  (Ex. P-13(e).)

65.   Mr. Harris' pain interfered with his ability to help his son play baseball. (Ex. P-13(e).)

66.   Mr. Harris' pain interfered with his ability to concentrate, read and study. (Ex. P-13(e).)

67.   The range of motion in Mr. Harris' neck was slightly reduced to forty-five degrees in rotation.  (N.T., 6/21/05, at 227.)

68.   Dr. Norelli reviewed an MRI taken on April 15, 2004.  (N.T., 6/21/05, at 229.)  This MRI showed a moderate size C5-6 central disc protrusion.  Id.

69.   On June 8, 2004, Mr. Harris underwent an EMG and nerve conduction test.  (Ex. P-13(h).)  These tests were suggestive of a nerve injury proximal to the left elbow. (Ex. P-13(I); N.T., 6/21/05, at 242-48.)  Mr. Harris' pain reduction with the use of a medication called Trileptal confirmed that there was nerve involvement in Mr. Harris' injury since that medication works to calm nerve roots.  (N.T., 6/21/05, at 242-43.)

70.   Dr. Norelli's opinion is consistent with that of Dr. Brody, that Mr. Harris suffered a "C6 radiculopathy on the left."  (Ex. P-12(b).)

71.   In July 8, 2004, Mr. Harris reported that he was seventy-five percent better.  (Ex. P-13(I).)

72.   Dr. Norelli counseled Mr. Harris to stretch certain muscles called the scalenes and the upper posterior cervicals.  Dr. Norelli also counseled Mr. Harris about his stance including a forward head position.  Dr. Norelli believed that Mr. Harris may be worsening his

stance with respect to the forward head position by his frequent use of the computer.  (Ex. P-13(I).)

73.   Mr. Harris last visited Dr. Norelli on September 2, 2004.  He was to return in three months, but did not.  At the last appointment, Dr. Norelli showed Mr. Harris how to do the scalene stretch and counseled that he could increase the dosage of Trileptal.  (Ex. P-13(j).)

**vi.   <u>Dr. Mandel</u>**

74.   Richard Mandel, M.D., testified as an expert in the fields of orthopaedics and orthopaedic surgery, and conducted an independent medical examination of Mr. Harris on August 11, 2004.  (N.T., 6/23/05 (Vol. II), at 61-62.)  To the extent set forth herein only, the court finds Dr. Mandel's testimony and opinions credible and supported by the record.

75.   Plaintiff suffered a minor spinal cord injury which is called a central cord syndrome.  (N.T., 6/23/05 (Vol. II), at 62.)  Dr. Mandel described Mr. Harris' injury as a bruise to the spinal cord in the cervical area which can result in numbness and weakness in the arms.  <u>Id.</u> at 63.  Dr. Mandel explained that in almost all cases of central cord syndrome, an MRI will reveal swelling within the spinal cord at the site of the injury.  <u>Id.</u>  Mr. Harris' injury was so mild that his MRI did not reveal swelling.  <u>Id.</u>

76.   Plaintiff suffered a small herniated disc at C5-6.  (N.T., 6/23/05 (Vol. II), at 64.)  Dr. Mandel noted that Mr. Harris had had five MRIs and that the disc herniation was seen on all of them.

77.   Dr. Mandel opined that Mr. Harris had recovered from any symptoms caused by the disc herniation, and that the disc herniation is not causing any radiculopathy or other problems, and will not do so in the future.  <u>Id.</u> at 67.  The court finds that the evidence

supports Dr. Norelli's and Dr. Brody's opinions that Mr. Harris has suffered some nerve injury proximal to the left elbow as a result of the Accident.[1]

78.     Plaintiff had some physical residuals from the Accident.  Specifically, Dr. Mandel opined that Mr. Harris has a "very slight weakness of grip in the left hand as compared to the right hand." (N.T., 6/23/05 (Vol. II), at 65.)  Dr. Mandel explained that in a right-handed person, such as Mr. Harris, the right hand is usually ten percent stronger than the left.  In Mr. Harris's case, the difference was twenty percent, so he had a decrease in grip strength of about ten percent over what would be expected in the left hand.  Id.  Dr. Mandel noted that Mr. Harris has one hundred pounds of grip in his left hand, and one hundred twenty pounds of grip in his right hand.  Id. at 66.  See also N.T., 6/22/05, at 158.

79.     The slight decrease in grip strength in his left hand "really wouldn't" limit Mr. Harris's day-to-day life.  (N.T., 6/23/05 (Vol. II), at 66.)

---

[1]     The court notes Dr. Mandel's testimony regarding  Mr. Harris' complaints of posterior neck pain and radiation of pain down his left arm and into his left hand.  (N.T., 6/23/05 (Vol. II), at 86.)  Dr. Mandel agreed that a person with a herniated disc could experience neck pain radiating down the arm.  However, that would not be the case with respect to Mr. Harris because his herniated disc was at C5-6, and his complaints were in the distribution of the C8 nerve root, which is not near the C5-6 disc.  Id. at 87.  While a disc herniation could affect nerve roots one level up or down, a C5-6 herniation would not affect a C8 nerve root.  Moreover, in order for a nerve root to be affected above or below the herniation, the herniation would have to be large enough to impress upon the spinal cord, not merely the fluid-filled thecal sack surrounding the cord.  Id. at 90.  Mr. Harris' herniation was not compressing the spinal cord.  Id.  Hence, Dr. Mandel opined that Mr. Harris' complaint of pain could not be correlated to his herniated disc.  Id. at 87.  However, the evidence in the record reveals that Mr. Harris did not have any spine or nerve problems prior to the Accident, but after the Accident experienced the symptoms related to a disc injury.  Mr. Harris consistently complained of pain radiating into his left forearm.  The EMG and nerve conduction tests ordered and interpreted by Dr. Norelli suggest a nerve injury proximal to Mr. Harris' left elbow.  Mr. Harris' improvement with the use of the drug Trileptal, a medication which calms nerve roots, confirms a nerve problem.  For these reasons, the court rejects this portion of Dr. Mandel's testimony.

80.    Mr. Harris also had "some reflexes that were more active than usual, but this does not really affect functioning."  Rather, the more active reflexes indicate that he had sustained an injury.  (N.T., 6/23/05 (Vol. II), at 66.)  Dr. Mandel explained that the reflex will remain overly active for the rest of Mr. Harris' life, but that it is not a sign of an ongoing injury, but simply indicates that he suffered an injury at some point in time.  Id. at 77-79.

81.    Mr. Harris raised other complaints.  Mr. Harris complained of intermittent loss of feeling in the ring and little finger of the left hand.  However, when Dr. Mandel tested his sensation, it was within normal limits.  (N.T., 6/23/05 (Vol. II), at 65.)  Dr. Mandel testified that Mr. Harris had no muscle atrophy and had "not lost any muscle bulk anywhere."  Id. at 65-66.

82.    Dr. Mandel opined that Mr. Harris was able to perform work at the light to moderate duty capacity, lifting up to thirty-five pounds occasionally and twenty-five pounds frequently.  (N.T., 6/23/05 (Vol. II), at 64.)  Dr. Mandel acknowledged that the limitation was "somewhat arbitrary," and that his opinion was based upon the small disc herniation at C5-6 and the minor spinal cord injury, not on any actual physical findings on examination.  (N.T., 6/23/05 (Vo. II), at 67.)  The court finds that the evidence supports limiting Mr. Harris to sedentary work consistent with the opinions of treating physician Dr. Star (Ex. P-8) and consultative physician Dr. Brody (Ex. P-12).

83.    Plaintiff can work as an attorney.  (N.T., 6/23/05 (Vol. II), at 64.)  This opinion is consistent with the opinions of Drs. Star and Brody that Mr. Harris can perform sedentary work.

84.    Mr. Harris should avoid activities that involve direct trauma to the head and neck.  Dr. Mandel explained that these would not be common or likely activities, and would

14

include diving off a high diving board, and playing tackle football.  (N.T., 6/23/05 (Vol. II), at 68.)

###### vii.   Mr. Harris' Physical Injuries Caused by the Accident

85.    In conclusion, after consideration of all the evidence in the record, the court finds that Mr. Harris suffered physical injuries caused by the Accident, some of which are permanent.  As a result of the Accident, Mr. Harris suffered a small to moderate sized disc herniation at C5-6.  Mr. Harris also suffered a mild central cord syndrome.  These conditions caused Mr. Harris to suffer pain, weakness in his left arm and leg, dizziness, and headaches.  Mr. Harris has recovered from his mild central cord syndrome and C5-6 disc herniation, except for some pain in the neck region which may radiate down into the left forearm and which waxes and wanes, a slight grip decrease in his left hand and some active reflexes.

86.    Mr. Harris' physical condition reached maximum physical recovery in July 2003; any deficits Mr. Harris currently has will be permanent.  (N.T., 6/23/05 (Vol. II), at 95-96; N.T., 6/22/05, at 163; Exs. P-8(f), P-12(a). P-12(b).)

87.    While Mr. Harris states that he feels pain in his neck "everyday all day," (N.T., 6/22/05, at 254), the court notes that Mr. Harris also testified that he is used to his pain and he "really doesn't notice it most of the time unless I think about it."  Id.  This is consistent with Mr. Harris' statement to Dr. Norelli on July 8, 2004, that he was seventy-five percent better.  (Ex. P-13(i).)

88.    As of May 17, 2005, Mr. Harris was receiving no active medical treatment, other than taking Effexor for depression and Trileptal for nerve pain.  (Ex. P-12(b).)

89.     While Mr. Harris continues to have some pain and residual weakness in the left hand, he can perform sedentary activity.  (N.T., 6/22/05, at 162; Exs. P-8(f), P-12(a), P-12(b).)  Mr. Harris can lift ten pounds on a regular, but not repetitive, basis.  (N.T., 6/22/05, at 162.)

**D.     Cognitive and Emotional Injuries From the Accident**

90.     In addition to physical injuries, Mr. Harris also contends that he suffered cognitive and emotional injuries from the Accident.

91.     Mr. Harris reported to his health care providers on various occasions complaints of cognitive and emotional problems including difficulty concentrating, memory problems, irritability, and anxiety.  (Exs. P-8, 9, 11.)

**i.     <u>Mild Traumatic Brain Injury</u>**

92.     Plaintiffs contend that Mr. Harris suffers from a mild traumatic brain injury which makes it impossible for him to pass the Pennsylvania bar examination and work as an attorney.

93.     The parties each presented an expert in the field of neuropsychology. Plaintiffs presented Dr. Terri Morris; defendant presented Dr. Idit Trope.

94.     Dr. Morris interviewed Mr. Harris on July 30, 2004.  Dr. Morris presented her findings in a report dated September 10, 2004, a supplemental letter dated April 1, 2005, and a second supplemental letter dated May 18, 2005.  These documents were admitted into evidence as Exhibit P-36.  The court finds Dr. Morris' ultimate conclusion that Mr. Harris suffers from a mild traumatic brain injury unsupported by the record.

16

95.     Dr. Trope interviewed Mr. Harris on August 17, 2004 and interviewed Mrs. Harris separately. (N.T., 6/23/05 (Vol. I), at 27-29.)  Dr. Trope presented her findings in a report admitted into evidence as Exhibit P-32(a), and a subsequent letter dated October 12, 2004, admitted into evidence as Exhibit P-32(b).  The court finds Dr. Trope's testimony and opinions credible and supported by the record.

96.     Dr. Trope conducted an extensive interview of Mr. Harris, and performed psychological tests and/or screenings, as well as tests and/or screenings in the areas of cognitive, academic and memory function.[2]  (N.T., 6/23/05 (Vol. I), at 29.)

97.     In addition to interviewing Mr. Harris, Dr. Trope reviewed a large volume of written materials and records including Mr. Harris' civil complaint and deposition, the police accident report, academic transcripts, and medical records.  (N.T., 6/23/05 (Vol. I), at 28-29.)

98.     Dr. Trope did not perform a neuropsychological evaluation because, in her opinion, nothing in the records she reviewed indicated that that evaluation was required.  (N.T., 6/23/05 (Vol. I), at 30, 54-59.)

99.     Dr. Trope testified that nowhere in the information she reviewed, including Mr. Harris' civil action complaint, were the terms "brain injury" or "frontal lobe injury" found.  (N.T., 6/23/05 (Vol. I), at 30-31.)

100.    The term "mild traumatic brain injury" first appeared in the April 1, 2005 supplemental letter prepared by Dr. Morris.  (N.T., 6/23/05 (Vol. I), at 33.)  In her original report, Dr. Morris did not opine that Mr. Harris suffered a "mild traumatic brain injury."  Id.

---

[2]     Dr. Trope explained that a "screening" is something other than a full test.  (N.T., 6/23/05, at 85.)

101.    Plaintiffs acknowledge that Dr. Morris, in her initial opinion, did not conclude that Mr. Harris suffered from a mild traumatic brain injury.  Counsel attempted to overcome this deficiency by reading the history of Mr. Harris' complaints summarized in Dr. Morris' report and asking Dr. Trope if the subjective symptoms could be consistent with a mild traumatic brain injury.  (N.T. 6/23/05 (Vol. II) at 57.)  Dr. Trope responded that the symptoms listed in Dr. Morris' report could be consistent with a mild traumatic brain injury.  Id.  Counsel then asked whether, even though Dr. Morris did not diagnose Mr. Harris with a mild traumatic brain injury, "everything about the report is suggestive of mild traumatic brain injury."  Id.  Dr. Trope responded no, and pointed out that Dr. Morris "didn't see it either."  Id.

102.    Dr. Morris explained, however, that the diagnosis is "assumed throughout the document because of the history I got of post concussion and all, but it's not at the very end. I should have put it in."  Id.  Dr. Morris contends that the diagnosis is implicit throughout her first report.  (N.T., 6/20/05, at 244.)  The court does not find Dr. Morris' explanation credible or supported by the record.

103.    None of the other physicians who examined Mr. Harris, except for Dr. Morris in the first supplemental letter, diagnosed Mr. Harris with a "mild traumatic brain injury." (N.T., 6/23/05 (Vol. I), at 67.)

104.    When asked whether all of Mr. Harris' other physicians "missed" the diagnosis of mild traumatic brain injury, Dr. Morris replied that the other physicians did not miss the symptoms.  (N.T., 6/20/05, at 247-48.)  She further explained that the other physicians in the case identified the diagnosis by other names.  Some of the physicians diagnosed Mr. Harris with PTSD, while Dr. Redenbaugh, the neurologist, diagnosed Mr. Harris with a "post concussion."

18

Id. at 248.  Dr. Morris further stated that medical professionals "talk differently in different disciplines."  Id.

105.    To the extent that Dr. Morris is stating that Mr. Harris' other physicians agree with her diagnosis of a traumatic brain injury, the court rejects this statement as unsupported by the record.  Rather, the record reveals that Mr. Harris' other physicians reviewed Mr. Harris' medical records and subjective complaints, and did not conclude that Mr. Harris suffered from a mild brain injury.

106.    Dr. Morris testified that a neurologist would make the diagnosis of a brain injury or mild traumatic brain injury "only to an extent."  (N.T., 6/20/05, at 131.)  Dr. Morris explained that the testing that a neurologist would do in the office is cursory and that a neurologist calls upon a neuropsychologist to make this diagnosis.  Id.  Dr. Morris also testified that "[a]ny neurologist will tell you that it's not something that they can look at and really get an in-depth assessment of the brain functioning."  Id.  While this is an attempt to explain why none of Mr. Harris' other physicians diagnosed him as suffering from a mild traumatic brain injury, plaintiffs presented no evidence to support Dr. Morris' conclusions.  The record contains no evidence that neurologists do not or cannot properly diagnosis a traumatic brain injury.  In fact, the evidence shows that Mr. Harris was referred to a neurologist, Dr. Redenbaugh, and that the neurologist did not refer Mr. Harris to a neuropsychologist.  Hence, the reasonable inference to draw is that Mr. Harris' neurologist did not believe that (1) he was unable to properly diagnose and treat Mr. Harris or that (2) Mr. Harris required the services of or treatment by a neuropsychologist.

107.     Mr. Harris saw Dr. Morris at the request of his counsel.  (N.T., 6/20/05, at 135.)

108.     A mild traumatic brain injury cannot be seen on an MRI or CAT scan. (N.T., 6/20/05, at 139.)  However, such an injury may be seen on a sophisticated scan such as a photon emission computed tomography, known as a PET scan, or a single photon emission tomography, known as a SPECT scan, because these scans show activity within the brain.  Id. at 140, 265-66.

109.     Mr. Harris did not have either a PET scan or a SPECT scan to confirm Dr. Morris' diagnosis of a mild traumatic brain injury.

110.     The memory system is sensitive to traumatic brain injury.  (N.T., 6/23/05 (Vol. I), at 34.)  A person who has a traumatic brain injury oftentimes has difficulty with memory.  Although Mr. Harris subjectively reports memory difficulty, his performance on memory function tests conducted by Drs. Morris and Trope was normal.  Id.  And see Exs. P-32, P-36.  On the memory test performed by Dr. Morris, Mr. Harris' general memory index score was 120.  A score of 100 was the average score.  Mr. Harris' score was in the ninety-first percentile and considered superior.  (N.T., 6/23/05, at 35.)  With respect to Mr. Harris' memory, Dr. Morris, plaintiffs' neuropsychology expert, stated:  "Minor problems noted in auditory verbal memory were on one test only; other memory scores were entirely normal."  (Ex. P-36.)

111.     The court does not credit the diagnosis by Dr. Morris that Mr. Harris suffers from a mild traumatic brain injury.[3]  Dr. Morris admitted that her initial report did not

----

[3]     Plaintiffs presented the testimony of Dr. Joanne Cohen, who was admitted to testify as an expert in neuropsychology and educational psychology.  (N.T., 6/21/05, at 63-210.) Dr. Cohen did not conduct any tests on Mr. Harris; rather, she reviewed the test results from the

contain a diagnosis of a mild traumatic brain injury.  (N.T., 6/20/05, at 244.)  In her initial report, Dr. Morris concluded that Mr. Harris' "most prominent findings were in motor skills (left hand weakness/slowness) and psychological functioning (stress, irritability, anxiety, depression)."  (Ex. P-36.)  Id.  Finally, Dr. Morris concluded that Mr. Harris suffered from only "mild cognitive findings" which were best explained by "significant stress, depression, and anxiety."  Id.

112.    The court does credit some parts of Dr. Morris' report.  Dr. Morris conducted a number of tests on Mr. Harris as listed in her September 10, 2004 report.  (Ex. P-36.)  On the Wechsler Adult Intelligence Scale – Third Edition (WAIS-III), measuring auditory attention and working memory, Mr. Harris scored in the forty-seventh percentile, the "low end of average range."  Id.  Subtest scores were average for mental arithmetic, digit span, and auditory sequencing.  Id.  Visual processing speed/attention was in the high end of average (sixty-sixth percentile).  On a more stringent test of visual scanning and visual tracking from the Halstead-Reitan (Trails A), Mr. Harris scored in the low average range.

113.    Using the WAIS-III test, Mr. Harris' prorated verbal I.Q. and verbal comprehension index were in the average range.  Dr. Morris noted that Mr. Harris' subtest scores ranged from high average to average for factual knowledge, analogical reasoning, vocabulary, mental arithmetic, and digit span.  She found no evidence of decline in verbal intellectual skills.

---

other professionals.  Id. at 102, 109, 190.  Prior to issuing her report, Dr. Cohen had not met the plaintiffs.  Id. at 168.  Dr. Cohen concluded that the "results of the accident indicate that he suffered a frontal lobe injury and that has made it impossible for him to function in a way that would allow him to pass the bar."  Id. at 103.  Dr. Cohen also concluded that because of the Accident and the frontal lobe injury, Mr. Harris not only could not pass the bar, if he did pass the bar, he could not "spend days as a successful practicing attorney."  Id. at 161.  Since this court finds that Mr. Harris did not suffer from a brain injury, the premise of Dr. Cohen's opinion fails and her opinion is not supported by the record.  This court does not find Dr. Cohen's opinion to be persuasive.

(Ex. P-36.)  On the Wide Range Achievement Test – Third Edition, Mr. Harris scored average marks in both arithmetic and reading.  Id.

114.    Again using the WAIS-III test, Mr. Harris scored in the average range on a prorated performance I.Q. and perceptual organization index.  Dr. Morris noted variability among the scores stating that Mr. Harris' performance was superior on an untimed task of matrix reasoning, but was lower on timed tasks of block assembly (low average) and finding missing visual details (average).  (Ex. P-36.)  On the task of copying a complex figure, Mr. Harris' performance was in the normal range.  Id.

115.    Mr. Harris contends that he has difficulty with his memory.  Dr. Morris administered several tests for memory.  On the Wechsler Memory Scale – Third Edition, Mr. Harris scored as follows:

```
Auditory Immediate . . . . . . . . . . . . . . . . . . . . . . . 105 (Average); 63rd percentile
Visual Immediate . . . . . . . . . . . . . . . . . . . . . 115 (High Average); 84th percentile
Immediate Memory  . . . . . . . . . . . . . . . . . . . 112 (High Average); 79th percentile
Auditory Delayed . . . . . . . . . . . . . . . . . . . . . . . 108 (Average); 70th percentile
Visual Delayed . . . . . . . . . . . . . . . . . . . . . . . . . 129 (Superior); 97th percentile
Auditory Recommend. Delayed . . . . . . . . . . 110 (High Average); 75th percentile
General Memory  . . . . . . . . . . . . . . . . . . . . . . . . 120 (Superior); 91st percentile
```

(Ex. P-36.)  Individual scores on this test were as follows:  Immediate auditory verbal recall for paragraph material was high average range; delayed recall was average range with only seventy-one percent retention (low average).  Immediate recognition memory for faces was high average; delayed recall was superior range with one hundred percent retention (high average).  Immediate recall of word pairs was high average; delayed recall was also high average with one hundred percent retention (high average).  Immediate and delayed recall of pictures (scenes) were high average range, with one hundred percent retention over a delay (high average).  Dr. Morris

concluded that overall, registration and free recall of lengthy verbal material was weak relative to recall/retention in other areas.  Id.

116.    On the California Learning Test II – Standard Form, Mr. Harris' ability to learn a word list over five trials was high average to superior for his age and gender.  Mr. Harris also demonstrated a good learning strategy, grouping the items on each recall trial to facilitate learning.  Short delay free recall, cued recall, and long term free and cured recall were all better than the norm.  Recognition memory was at the mean.  Immediate and complex visual memory (Rey Osterreith Complex Figure with Recall) was in the normal range.  (Ex. P-36.)

117.    Mr. Harris' receptive and expressive language were normal.

118.    Dr. Morris contends that Mr. Harris suffered injury to the part of his brain that deals with executive function.  Dr. Morris tested Mr. Harris' executive function and found his performance to be variable.  (Ex. P-36.)  On a test of underlying principles to solve problems (Category Test), Mr. Harris' overall score was in the low end of average for age, race, education and gender.  Id.  Performance on a card sorting task (Wisconsin) was normal.  Cognitive test shifting/flexibility was in the high end of average range (Trails B) with no errors.  On list generation tasks, performance was in the borderline to mild impairment range for naming to letter.  In naming to category, however, Mr. Harris scored in the high average to superior range. Id.

### ii.    **Stress, Depression and Anxiety**

119.    Dr. Morris administered to Mr. Harris the Beck Depression Inventory – II test.  Mr. Harris' score on this test was in the severe range; his score on the Beck Anxiety Inventory was in the mild range.  (Ex. P-36.)

120.    Dr. Morris concluded as follows in her September 10, 2004 report:

The most prominent findings were in motor skills (Left hand
weakness/slowness) and psychological functioning (stress, irritability, anxiety,
depression).  Minor problems noted in auditory verbal memory were on one test
only; other memory scores were entirely normal.  Performance on tests of higher
level problem solving were not consistently low, as he had normal scores on two
tasks.  The mild cognitive findings (attention, mild slowness, verbal memory,
problem solving) on this exam are best explained by significant stress, depression,
and anxiety.

(Ex. P-36.)

121.    Dr. Morris attributed Mr. Harris' mild cognitive findings to stress,

depression and anxiety.  (Ex. P-36.)

122.    Prior to the Accident, Mr. Harris had considerable stressors in his life,

including, Mrs. Harris' diagnosis with cancer, financial problems, and inconsistent educational

performance.

123.    Mr. Harris suffered additional stressors as a result of the Accident.  The

court finds that Mr. Harris suffered, at most, emotional problems attributable to stress, depression

and anxiety related to the Accident.

124.    Mr. Harris received treatment for his stress, depression and anxiety.

125.    Mr. Harris received therapy from Barbara P. Johnson, a licensed clinical

social worker from June 2003 through February 2004.  (Ex. P-21.)  Mr. Harris was referred to

Ms. Johnson by his primary care physician, Dr. Winas, who made a tentative diagnosis of a panic

disorder.  (Ex. P-21(a).)  At his initial evaluation on June 5, 2003, Mr. Harris complained of

suffering several episodes of anxiety.  Id.  Mr. Harris also complained of "some memory

problems and feelings of anxiety, depression and insecurity about his professional future." Id.

Mr. Harris reported that he "has been relieved of most symptoms while on the Paxil." Id.

      126.    Ms. Johnson prepared a clinical summary after her first meeting with Mr.

Harris in which she stated:

> Client appears to have developed a panic disorder precipitated by the trauma of a collision with a truck in May 2002.  He also appears to have symptoms of posttraumatic stress disorder which seems to be somewhat remitting as is the panic disorder with the Paxil.  He is particularly concerned about his future.  He is uncertain whether or not he can concentrate and retain the focus necessary to pass the bar exam in February 2003.

(Ex. P-21(a).)

      127.    At his June 24, 2003 therapy session with Ms. Johnson, Mr. Harris did not

complain of problems with his memory and his cognition was normal.  He complained of

difficulty concentrating.  His mood was depressed and Ms. Johnson noted that the depression

was a result of chronic pain and anxiety.  (Ex. P-21(b).)  On July 2, 2003, Mr. Harris stated that

he had a bad week.  His wife had increased demands at work and his children were home for the

summer.  (Ex. P-21(c).)  Ms. Johnson referred Mr. Harris to an outpatient treatment program for

a higher level of treatment.  Id.  And see Ex. P-21(d).

      128.    On July 9, 2003, Mr. Harris reported anxiety about returning to work,

finances, and his marriage.  (Ex. P-21(d).)  The treatment note indicates that Dr. Marvi had

prescribed Neurontin and that this medication helped Mr. Harris to feel calmer.  Id.  Mr. Harris

reported no difficulty with his memory at this appointment and his cognition was normal.  Id.

129.    Mr. Harris reported that the outpatient treatment program was helpful. (Ex. P-21(g).)  Mr. Harris missed an appointment on August 26, 2003, and reported that he had forgotten the time but was feeling "a lot better."  (Ex. P-21(h).)

130.    On September 2, 2003, Mr. Harris had no complaints about concentration or memory, and his ambition and depressed mood were better.  He reported that he was feeling less anxious and was "starting to think about studying for the bar exam."  (Ex. P-21(I).)

131.    On October 13, 2003, Mr. Harris reported that he panicked while driving to his appointment and that his marriage "isn't good."  (Ex. P-21(k).)  He also stated that it was "hard to work toward taking [the] bar."  Id.  On November 10, 2003, Mr. Harris reported that he was irritable, studying for the bar, and having problems with retention.  (Ex. P-21(m).)

132.    In the final treatment note in the record with Ms. Johnson, on January 14, 2004, Mr. Harris reported that he had had a panic episode the preceding week.  (Ex. P-21(n).)  Ms. Johnson noted that his mood was slightly anxious.  Id.  Despite the single panic episode the week before, Mr. Harris believed he had had "net improvements."  Id.

133.    While seeing Ms. Johnson, Mr. Harris also met with Kenneth J. Zemanek, M.D., a psychiatrist.  (Ex. P-20.)  Mr. Harris' primary complaint was anxiety following the Accident.  After an initial meeting with Mr. Harris on August 11, 2003, Dr. Zemanek noted the following diagnoses:  (1) posttraumatic stress disorder ("PTSD"), residual; (2) major depressive disorder, single episode, improved; (3) panic disorder, improved; and (4) generalized anxiety disorder vs. residual posttraumatic stress disorder symptoms.  (Ex. P-20(a).)

134.    On September 15, 2003, Mr. Harris reported to Dr. Zemanek that he was free of anxiety and panic symptoms.  He was not feeling depressed but continued to have

26

difficulty sleeping.  Dr. Zemanek prescribed medication to help Mr. Harris to sleep.  (Ex. P-20(b).)

135.    Mr. Harris next met with Dr. Zemanek on November 24, 2003.  Mr. Harris reported doing "a little bit better," and that he was sleeping better with medication.  He only suffered occasional anxiety, had one nightmare about the Accident, and had "rare panic symptoms."  (Ex. P-20(c).)  Mr. Harris reported that as of that date, he no longer was seeing Ms. Johnson for therapy.  Id.  His mental status examination was normal and his condition was improved.  Id.  (Ex. P-20(d).)

136.    On February 9, 2004, Mr. Harris reported to Dr. Zemanek that he was still feeling anxious and panicky.  (Ex. P-20(e).)  He was trying to study for the bar examination but felt that he would not pass the test.  Id.  Mr. Harris reported that he was having trouble sleeping and when he could not sleep he would have trouble studying.  Id.  Mr. Harris stopped taking the medication to help him sleep because a family member told him he was taking an overdose.  Id.  Dr. Zemanek instructed Mr. Harris to take the medication.  Id.  Dr. Zemanek and Mr. Harris also "explored how he is ambivalent about taking the bar exam and trying to rationalize why he won't do well."  Id.

137.    On April 26, 2004, Mr. Harris reported to Dr. Zemanek that "it looks like he has failed the board."  (Ex. P-20(g).)  Mr. Harris was having no panic symptoms.  Mr. Harris continued to have difficulty sleeping and Dr. Zemanek referred him to a sleep study to rule out sleep apnea.  Id.

138.    On August 2, 2004, Dr. Zemanek reported that the sleep study showed that Mr. Harris has a moderate degree of sleep apnea.  (Ex. P-20(i).)  Mr. Harris felt better the day

after he used a CPAP machine to help him sleep.  Id.  Mr. Harris no longer had nightmares.  He

felt overwhelmed and anxious about taking psychological tests, and he was not getting out of the

house much.  Id.  In this final appointment with Mr. Harris, Dr. Zemanek diagnoses were:  (1)

mood disorder, secondary to sleep apnea; and (2) panic disorder with some agoraphobia.  Id.

139.    Mr. Harris suffered PTSD after the Accident.  From the treatment notes

from Ms. Johnson and Dr. Zemanek, the PTSD was related to the Accident.  As of his final

appointments with these treating sources, Mr. Harris' PTSD had resolved.  As of August 2, 2004,

Mr. Harris no longer had nightmares.  (Ex. P-20(i); N.T., 6/23/05 (Vol. I), at 38-39.)

Additionally, Mr. Harris no longer avoided being in cars.  (N.T., 6/23/05 (Vol. II), at 51.)

140.    Dr. Morris evaluated Mr. Harris on July 30, 2004.  (Ex. P-36.)  In her

initial report, Dr. Morris noted that Mr. Harris had been diagnosed with PTSD.  Id.  However,

Dr. Morris did not attribute Mr. Harris' difficulties to PTSD.

**iii.    Emotional and Cognitive Injuries Caused by the Accident**

141.    In conclusion and for the reasons set forth in the body of this decision, Mr.

Harris has failed to prove that he suffered a mild traumatic brain injury.

142.    Mr. Harris suffered from PTSD caused by the Accident which abated as of

September 2004.  (Ex. P-20(i); N.T. 6/23/05 (Vol. I), at 38-39.)

143.    Mr. Harris suffered from depression and anxiety following the Accident.

Mr. Harris' depression and anxiety were related to several factors.  He was depressed because of

pain from the Accident.  He was anxious because of the Accident and about taking the bar

examination.  He had difficulty concentrating because of the depression and anxiety, but also

because he suffered from an underlying sleep disorder, sleep apnea.  Mr. Harris received

diagnosis and treatment for his sleep apnea.  See Ex. P-20(i).  Mr. Harris' depression and anxiety

abated in the Fall of 2004 when he was diagnosed with sleep apnea and stopped receiving

treatment.  After Mr. Harris was diagnosed with moderate sleep apnea, Dr. Zemanek concluded

that Mr. Harris' mood disorder was secondary to sleep apnea.  Id.

     **E.**    **Damages**

      144.    Plaintiffs presented the testimony and report of economic expert Andrew

Verzilli.  (Ex. P-38.)  Defendant presented the testimony and reports of economic experts Jasen

Walker (Ex. P-35(a) and P-35(b)) and Stephanie Thomas (Ex. P-34(a)).

      145.    Plaintiffs contend that but for the Accident, Mr. Harris would have

finished the course work for his law degree in June or July 2002 (after completing two courses to

replace the one he failed in the Fall 2001 and the one he did not take in the Spring 2002), taken

and passed the bar examination in July 2002, and begun work as an attorney immediately

thereafter.  (N.T., 6/20/05, 87-88.)  While this seems like an extremely ambitious game plan, the

court will credit plaintiffs' testimony that this was their intention.

      146.    In light of the foregoing, at most, the Accident delayed Mr. Harris from

taking the bar examination from July 2002 until February 2005, a period of two years and seven

months.  The court determines that until the Fall of 2004, Mr. Harris continued to seek treatment

for PTSD, depression and anxiety.  At that time, Mr. Harris was diagnosed with moderate sleep

apnea and Dr. Zemanek concluded that Mr. Harris' mood disorder was secondary to the sleep

apnea.  See Ex. P-20(i).  His emotional injuries from the Accident had abated as of September of

2004, id., and his physical injuries reached their maximum recovery in July of 2003.  (Exs. P-

12(a) and P-12(b).)  Mr. Harris next was eligible to take the bar examination in February 2005.

With proper preparation, Mr. Harris was capable of taking and passing the bar examination in February 2005.[4]

147.    The court further finds that Mr. Harris was capable of performing work as a law clerk starting in September of 2004.  Hence, due to the Accident, considering Exhibits P-34, P-35 and P-38, and considering Mr. Harris' duty to mitigate his damages, Mr. Harris suffered a gross salary loss of one hundred and thirty thousand dollars ($130,000.00).

148.    The court further finds that Mr. Harris suffered additional damages in the amount of five hundred and twenty thousand dollars ($520,000.00) for past and future physical pain and suffering, past emotional pain and suffering, and past and future loss of life's pleasures related to the persistent physical injuries.[5]

_____

[4]    In reaching this conclusion, the court recognizes that Mr. Harris took and failed the bar examination in February 2005.  However, Mr. Harris had not been active in the study of law since the Fall of 2002, and he did not take a bar review course.  Additionally, he took the bar examination while this lawsuit, a significant distraction, was pending.  These facts, and not any cognitive deficiencies, contributed to his failure to pass the examination.

[5]    Plaintiffs have introduced no evidence of Mr. Harris' medical expenses and thus no award is given for this category of damages.  Plaintiffs also seek a monetary award for Mr. Harris' outstanding student loans.  However, this court has made an award for Mr. Harris representing lost income during the time period of July 2002 through the August 2004 when Mr. Harris was unable to work due to the physical and emotional injuries from the Accident.  Plaintiffs would have paid the student loans from these wages; therefore, making an award of compensation and the student loans would be to award double damages.  Furthermore, the court finds that the injuries resulting from the Accident do not preclude Mr. Harris from practicing as an attorney; thus, he can maximize the benefits of his higher education.  Additionally, Mrs. Harris asserted a claim for loss of consortium.  The filing of a claim with the administrative agency is an indispensable jurisdictional prerequisite to instituting a lawsuit in federal court.  28 U.S.C. § 2675(a).  See Livera v. First Nat'l State Bank of New Jersey, 879 F.2d 1186, 1194 (3d Cir.) ("Because the Federal Tort Claims Act constitutes a waiver of sovereign immunity, the Acts established procedures have been strictly construed."), cert. denied, 493 U.S. 937 (1989).  This provision is jurisdictional and cannot be waived.  Bialowas v. United States, 443 F.2d 1047, 1048-49 (3d Cir. 1971).  Plaintiffs, although aware of this issue prior to trial as it was raised in the Government's Trial Memorandum, have not proved that they filed an administrative claim

149.    The total amount awarded to plaintiffs is six hundred and fifty thousand dollars ($650,000.00).

Having made the above findings of fact, the court makes the following:

## II.    CONCLUSIONS OF LAW

1.    Plaintiffs John and Kimberly Harris have brought a claim under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-80 against the United States of America in which they allege damages resulting from a United States Postal Service truck impacting Mr. Harris' vehicle while Mr. Harris sat at a red light.  The Federal Tort Claims Act is the exclusive waiver of sovereign immunity for claims against the United States for money damages caused by the negligent or wrongful act of an employee of the government while acting within the scope of his employment.  28 U.S.C. § 1356(b).

2.    In an action under the Federal Tort Claims Act, the United States is liable to a plaintiff to the same extent that a private person "would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).  It is undisputed that the law of Pennsylvania applies.

3.    Under the Federal Torts Claims Act, a plaintiff is not entitled to a trial by jury; the case must be tried by the court without a jury.  28 U.S.C. § 2675(b).

---

for loss of consortium by Mrs. Harris and, therefore, the court lacks subject matter jurisdiction over Mrs. Harris' claim.  See Matsko v. United States, 2005 WL 2416337, at *5 (W.D. Pa. Sept. 30, 2005) ("When the law of Pennsylvania is applicable, courts have consistently held that spouses claiming loss of consortium under the FTCA are required to file a separate administrative claim as a jurisdictional prerequisite to bringing suit.") (internal quotation omitted, citing cases); Fergusen v. United States, 793 F. Supp. 107, 110 (E.D. Pa. 1992) (wife's loss of consortium claim barred and must be dismissed for lack of subject matter jurisdiction for failure to pursue administrative remedies under the Federal Tort Claims Act).

4.     Attorneys' fees are capped at twenty-five percent of any judgment in a plaintiff's favor and are not awarded separately.  28 U.S.C. § 2678.

5.     Mr. Harris has met his burden of proving that he suffered physical and emotional injuries as a result of the Accident to the extent detailed above in the court's Findings of Fact.  While Mr. Harris has proven that he suffers permanent physical injuries as set forth above in the court's Findings of Fact, Mr. Harris has not proven that he suffers from continued emotional/cognitive injuries.

6.     Plaintiffs shall be awarded the sum of six hundred and fifty thousand dollars ($650,000.00) as total damages for the injuries suffered as a result of the Accident.

For all the above reasons, judgment will be entered in favor of plaintiffs and against defendant as set forth herein.

BY THE COURT:


_____
THOMAS J. RUETER
United States Magistrate Judge